**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTINA PHAM, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> REATA PHARMACEUTICALS, INC., J. WARREN HUFF, and MANMEET S. SONI, <br><br> Defendants. | **Case No:** <br><br> **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Christina Pham ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by

1

Defendants, public filings, wire and press releases published by and regarding Reata Pharmaceuticals, Inc. ("Reata" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Reata securities between November 9, 2020 and December 8, 2021, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged

misstatements entered and the subsequent damages took place in this judicial district.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

6.    Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Reata securities during the Class Period and was economically damaged thereby.

7.    Defendant Reata is a clinical-stage biopharmaceutical company that focuses on small-molecule therapeutics. One of its two lead product candidates is bardoxolone methyl ("bardoxolone"), which is being developed for multiple indications, including chronic kidney disease ("CKD") caused by Alport syndrome ("AS"). Reata is incorporated under the laws of Delaware with its principal executive offices located in Plano, Texas. Reata's Class A common stock trades on the NASDAQ exchange ("NASDAQ") under the symbol "RETA."

8.    Defendant J. Warren Huff ("Huff") was the Company's Chief Executive Officer at all relevant times.

9.     Defendant Manmeet S. Soni ("Soni") was the Company's Chief Financial Officer at all relevant times.

10.     Defendants Huff and Soni are collectively referred to herein as the "Individual Defendants."

11.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

12.    Reata is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Reata under *respondeat superior* and agency principles.

14.    Defendant Reata and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading
### Statements Issued During the Class Period

15.    The Class Period begins on November 9, 2020. On that day, Reata announced the results from Year 2 of the Phase 3 CARDINAL study in a press release that stated, in relevant part:

> Reata Pharmaceuticals, Inc. (Nasdaq:RETA) ("Reata" or the "Company," or "we"), a clinical-stage biopharmaceutical company, today announced that the ***Phase 3 CARDINAL study of bardoxolone methyl ("bardoxolone") in patients with chronic kidney disease ("CKD") caused by Alport syndrome met its primary and key secondary endpoints at the end of Year 2.*** At Week 100, in the intent-to-treat ("ITT") population, which included estimated glomerular filtration rate ("eGFR") values for patients who either remained on or discontinued study drug, patients treated with bardoxolone had a statistically significant improvement compared to placebo in mean change from baseline in eGFR of 7.7 mL/min/1.73 m2 (p=0.0005). In

the modified ITT ("mITT") analysis, which assessed the effect of receiving treatment by excluding values after patients discontinued treatment, patients treated with bardoxolone had a statistically significant improvement compared to placebo in mean change from baseline in eGFR at Week 100 of 11.3 mL/min/1.73 m2 (p<0.0001). At Week 104 (four weeks after last dose in second year of treatment), patients in the ITT population treated with bardoxolone had a statistically significant improvement compared to placebo in mean change from baseline in eGFR of 4.3 mL/min/1.73 m2 (p=0.023). Bardoxolone treatment was generally reported to be well-tolerated. In the long-term extension study ("EAGLE"), for the 14 patients who completed three years of treatment, bardoxolone treatment resulted in a mean increase from baseline in eGFR of 11.0 mL/min/1.73 m2. *Based on these positive results and following a recently completed pre-NDA meeting with the U.S. Food and Drug Administration ("FDA"), we plan to proceed with the submission of an NDA for full marketing approval in the United States in the first quarter of 2021.* We also plan to pursue marketing approval outside of the United States and work has commenced on preparations to file for marketing approval in Europe.

* * *

"Chronic kidney disease caused by Alport syndrome is a serious, progressive disease with an urgent need for new therapeutic options. *The two-year CARDINAL study, now complete, represents the first time that an investigational medicine has shown a significant clinical benefit in this disease*, and it marks an important step toward making a treatment available for patients with Alport syndrome. We look forward to submitting our New Drug Application for bardoxolone in the first quarter of 2021. On behalf of everyone at Reata, I would like to express my sincere appreciation to all of the patients, families, and investigators who participated in the CARDINAL study," said Warren Huff, Reata's President and Chief Executive Officer.

* * *

*In rare forms of CKD, the FDA has accepted the off-treatment endpoint as the basis for approval.* Withdrawal of drug after long-

6

term treatment provides evidence whether a drug either protected or harmed the kidney during treatment. If off-treatment changes in eGFR are higher than placebo, this is evidence that the drug protected the kidney during treatment, and, if off-treatment changes in eGFR are lower than placebo, this is evidence that the drug harmed the kidney during treatment. ***An off-treatment eGFR benefit relative to placebo provides evidence that drug treatment may delay kidney failure.***

(Emphasis added.)

16.    Also on November 9, 2020, the Company filed its quarterly report on

Form 10-Q for the period ended September 30, 2020, stating, in relevant part:

**Bardoxolone for CKD Caused by Alport Syndrome**

On November 9, 2020, we announced that the ***Phase 3 CARDINAL study of bardoxolone in patients with CKD caused by Alport syndrome met its primary and key secondary endpoints at the end of Year 2.*** At Week 100, in the intent-to-treat (ITT) population, which included eGFR values for patients who either remained on or have discontinued study drug, patients treated with bardoxolone had a statistically significant improvement compared to placebo in mean change from baseline in estimated glomerular filtration rate (eGFR) of 7.7 mL/min/1.73 m2 (p=0.0005). In the modified ITT (mITT) analysis, which assessed the effect of receiving treatment by excluding values after patients discontinued treatment, patients treated with bardoxolone had a statistically significant improvement compared to placebo in mean change from baseline in eGFR at Week 100 of 11.3 mL/min/1.73 m2 (p<0.0001). At Week 104 (four weeks after last dose in second year of treatment), patients in the ITT population treated with bardoxolone had a statistically significant improvement compared to placebo in mean change from baseline in eGFR of 4.3 mL/min/1.73 m2 (p=0.023). Bardoxolone treatment was generally reported to be well-tolerated. ***Based on these positive results and following a recently completed pre-NDA meeting with the U.S. Food and Drug Administration (FDA), we plan to proceed with the submission of an NDA for full marketing approval in the United States in the first quarter of 2021.*** We also plan to pursue

marketing approval outside of the United States and work has commenced on preparations to file for marketing approval in Europe.

(Emphasis added.)

17.    On March 1, 2021, Reata announced that it had submitted its NDA for bardoxolone as a treatment of CKD caused by AS. The Company's press release stated, in relevant part:

> Reata Pharmaceuticals, Inc. (Nasdaq: RETA) ("Reata," the "Company," or "we"), a clinical-stage biopharmaceutical company, today announced that it has submitted a New Drug Application ("NDA") for bardoxolone methyl ("bardoxolone") for the treatment of chronic kidney disease ("CKD") caused by Alport syndrome to the U.S. Food and Drug Administration ("FDA").
>
> ***This NDA submission is based on the efficacy and safety data from the CARDINAL Phase 3 clinical trial.*** The submission includes a request for Priority Review, which, if granted, would shorten the FDA's review of the NDA to eight months from the time of submission, versus a standard review timeline of 12 months. ***If approved, bardoxolone would become the first therapy specifically indicated for the treatment of CKD caused by Alport syndrome.***
>
> "This NDA submission marks an important step toward making a treatment available for patients with Alport syndrome, a serious, progressive disease with an urgent need for new therapeutic options," said Warren Huff, Reata's President and Chief Executive Officer. "I want to thank all those who made this moment possible, especially Alport syndrome patients and their families. We look forward to next steps on the path to making bardoxolone available as a first-in-class therapy for Alport syndrome, pending NDA acceptance, review, and drug approval."

(Emphasis added.)

18.    Also on March 1, 2021, Reata filed its annual report on Form 10-K for the period ended December 31, 2020. Regarding risks impacting regulatory approval of any of its product candidates, Reata stated, in relevant part:

***The clinical and commercial success of bardoxolone and omaveloxolone will depend on a number of factors, many of which are beyond our control.***

The clinical and commercial success of bardoxolone and omaveloxolone will depend on a number of factors, including the following, many of which are beyond our control:

- the timely initiation, continuation, and completion of our Phase 2 and Phase 3 clinical trials for bardoxolone and omaveloxolone, which will depend substantially upon requirements for such trials imposed by the FDA and other regulatory agencies and bodies;
- our ability to demonstrate the safety and efficacy of our product candidates to the satisfaction of the relevant regulatory authorities;
- whether the FDA or other regulatory authorities will accept NDAs for approval of our product candidates;
- whether we are required by the FDA or other regulatory authorities to conduct additional clinical trials, and the scope and nature of such clinical trials, prior to approval to market our products;
- the timely receipt of necessary marketing approvals from the FDA and foreign regulatory authorities, including pricing and reimbursement determinations;
- the ability to successfully commercialize our product candidates for marketing and sale, if approved by the FDA or foreign regulatory authorities, whether alone or in collaboration with others;
- our ability and the ability of third-party manufacturers to manufacture the quantities of our product candidates with quality attributes necessary to meet regulatory requirements and

at a scale and yield sufficient to meet anticipated demand at a cost that allows us to achieve profitability;

- our success in educating health care providers and patients about the benefits, risks, administration, and use of our product candidates, if approved;

- acceptance of our product candidates, if approved, as safe and effective by patients and the healthcare community;

- the achievement and maintenance of compliance with all regulatory requirements applicable to our product candidates, our third-party manufacturers, and our internal operations;

- the maintenance of an acceptable safety profile of our products, if any, following any approval;

- the availability, perceived advantages, relative cost, relative safety, and relative efficacy of alternative and competitive treatments;

- our ability to provide approved product with a convenient and patient-friendly capsule configuration;

- our ability to successfully enforce our intellectual property rights for our product candidates and against the products of potential competitors; and

- our ability to avoid or succeed in third-party patent interference or patent infringement claims.

We cannot assure you that we will ever be able to achieve profitability through the sale of, or royalties from, our product candidates. If we or our collaborators are not successful in obtaining approval for and commercializing our product candidates, or are delayed in completing those efforts, our business and operations would be adversely affected.

(Emphasis added.)

19.    On April 26, 2021, Reata announced that the FDA had accepted the NDA submission and set an action date for February 25, 2022. The Company's press release stated, in relevant part:

Reata Pharmaceuticals, Inc. (Nasdaq: RETA) ("Reata," the "Company," or "we"), a clinical-stage biopharmaceutical company,

today announced that the U.S. Food and Drug Administration ("FDA") accepted for filing the New Drug Application ("NDA") for bardoxolone methyl ("bardoxolone") for the treatment of patients with chronic kidney disease ("CKD") caused by Alport syndrome.

***This NDA submission is based on the efficacy and safety data from the CARDINAL Phase 3 clinical trial.*** The FDA will review the application under a Standard Review timeline. The Prescription Drug User Fee Act ("PDUFA") date, the FDA action date for the application, is scheduled for February 25, 2022. The FDA also advised the Company that it is currently planning to hold an Advisory Committee meeting to discuss the application.

"We are pleased with the FDA's decision to accept for filing our NDA for bardoxolone and look forward to continuing to work with the Division during the review process," said Warren Huff, Reata's President and Chief Executive Officer. "Alport syndrome is one of the most rapidly progressive forms of CKD and a truly devastating disease to those patients and the families who are affected by it. ***If approved, bardoxolone may be the first therapy to slow the progression of kidney disease in patients with this serious and debilitating disease."***

(Emphasis added.)

20.    On May 6, 2021, Reata announced its first quarter 2021 financial results and provided an update on its clinical development programs. The press release stated, among other things:

**Recent Company Highlights**

*Bardoxolone Methyl ("Bardoxolone") in Patients with Alport Syndrome*

In April 2021, we announced that the U.S. Food and Drug Administration ("FDA") accepted for filing Reata's New Drug Application ("NDA") for bardoxolone for the treatment of patients with chronic kidney disease ("CKD") caused by Alport syndrome.

The FDA will review the application under a Standard Review timeline. The Prescription Drug User Fee Act ("PDUFA") date, the FDA action date for the application, is scheduled for February 25, 2022. **The FDA also advised us that it is currently planning to hold an Advisory Committee meeting to discuss the application. If approved, bardoxolone may become the first therapy specifically indicated for the treatment of CKD caused by Alport syndrome.**

"We made significant progress during the first quarter of 2021 with the submission of our NDA for bardoxolone for the treatment of CKD caused by Alport syndrome coming less than four months after reporting positive results from Year 2 of our Phase 3 CARDINAL trial," said Warren Huff, Reata's President and Chief Executive Officer. "Alport syndrome is a devastating disease that affects 30,000 to 60,000 patients in the United States. We are pleased with the FDA's recent decision to accept our application for filing and look forward to continuing to work with the FDA during its review of our application."

(Emphasis added.)

21.     On May 6, 2021, Reata filed its quarterly report on Form 10-Q for the

period ended March 31, 2021, stating, in relevant part:

**Bardoxolone in Patients with CKD Caused by Alport Syndrome**

On April 26, 2021, we announced that the U.S. Food and Drug Administration (FDA) accepted for filing the New Drug Application (NDA) for bardoxolone for the treatment of patients with CKD caused by Alport syndrome. The FDA will review the application under a Standard Review timeline. The Prescription Drug User Fee Act (PDUFA) date, the FDA action date for the application, is scheduled for February 25, 2022. The FDA also advised us that it is currently planning to hold an Advisory Committee meeting to discuss the application.

Our NDA submission was based on the results of Year 2 of the Phase 3 CARDINAL study of bardoxolone in patients with CKD caused by Alport syndrome announced in November 2020. The study met its

primary and key secondary endpoints following two years of treatment (referred to as Year 2). Moreover, we also announced that patients who completed one year in the EAGLE long-term extension study and were treated with bardoxolone for a total of three years (n=14) showed a sustained and significant increase from baseline in estimated glomerular filtration rate (eGFR). ***Together, these data suggest that bardoxolone treatment has beneficial long-term effects on kidney function in patients with Alport syndrome.***

(Emphasis added.)

22.    On August 9, 2021, Reata announced its second quarter 2021 financial results and provided an update on its clinical development programs. The press release stated that, during a mid-cycle communication meeting about the NDA, the FDA had "identified four significant clinical and statistical review issues" for Reata to address. Specifically, the Company stated:

*Bardoxolone Methyl ("Bardoxolone") in Patients with Alport Syndrome*

The NDA for bardoxolone for the treatment of patients with chronic kidney disease ("CKD") caused by Alport syndrome is currently under review by the FDA. The FDA completed a bio-research monitoring inspection of Reata. We did not receive any observations. We also recently completed a mid-cycle communication meeting with the FDA. While we have not yet received formal minutes from the FDA, in the preliminary agenda for, and during, the meeting, the FDA identified four significant clinical and statistical review issues for us to address. The FDA invited us to respond to its identified issues in follow-up submissions to the NDA, and we believe each of the identified issues is addressable with additional data and analyses. The FDA did not designate any safety issues as significant issues, and it stated that, based on its current review, it does not believe a Risk Evaluation and Mitigation Strategies ("REMS") program is needed. The FDA also advised us that an Advisory Committee meeting is tentatively scheduled for December 8, 2021. The Prescription Drug

User Fee Act ("PDUFA") date, the FDA action date for the application, is scheduled for February 25, 2022.

23.    On August 9, 2021, Reata filed its quarterly report on Form 10-Q for

the period ended June 30, 2021, stating, in relevant part:

**Bardoxolone in Patients with CKD Caused by Alport Syndrome**

On April 26, 2021, we announced that the U.S. Food and Drug Administration (FDA) accepted for filing the NDA for bardoxolone for the treatment of patients with CKD caused by Alport syndrome, and the NDA is currently under review by the FDA. The FDA completed a bio-research monitoring inspection of Reata. We did not receive any observations. We also recently completed a mid-cycle communication meeting with the FDA. ***While we have not yet received formal minutes from the FDA, in the preliminary agenda for, and during, the meeting, the FDA identified four significant clinical and statistical review issues. We believe each of these issues are addressable with additional data and analyses, and the FDA invited us to address its identified issues in follow-up submissions to the NDA.*** We plan to address each of the issues through the submission of additional data and analyses to the NDA. See Programs in Chronic Kidney Disease – Bardoxolone in Patients with CKD Caused by Alport Syndrome below.

***The FDA made additional information requests and identified a few additional issues that were not deemed significant.*** The FDA did not designate any safety issues as significant issues, and it stated that, based on its current review, it does not believe a Risk Evaluation and Mitigation Strategies (REMS) program is needed. We were notified that we would be receiving comments in writing regarding Chemistry, Manufacturing, and Controls (CMC), and we will not be receiving any nonclinical comments. The FDA also advised us that an Advisory Committee meeting is tentatively scheduled for December 8, 2021. The Prescription Drug User Fee Act (PDUFA) date, the FDA action date for the application, is scheduled for February 25, 2022.

(Emphasis added.)

24.    The above statements identified in ¶¶ 15-23 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) the FDA had raised concerns regarding the validity of the clinical study designed to measure the efficacy and safety of bardoxolone for the treatment of CKD caused by AS; (2) as a result, there was a material risk that Reata's NDA would not be approved; and (3) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

25.    On December 6, 2021, the FDA released briefing documents in advance of an Advisory Committee meeting for the Company's NDA for bardoxolone, stating that the agency had repeatedly questioned the validity of Reata's study design because bardoxolone's pharmacodynamic effect on kidney function would make the results difficult to assess the effectiveness of the drug. Specifically, the briefing document noted that, "[i]n September 2018, FDA encouraged [Reata] to request an end-of-phase 2 meeting to discuss the development program and ensure alignment," but Reata declined. Then, in February 2019, the FDA "emphasized the importance of obtaining FDA concurrence that a study intended to support a marketing application was adequate

and acceptable for this purpose." The briefing document detailed the concerns the

FDA had raised with Reata during the course of the clinical studies and NDA

submission:

- Bardoxolone's pharmacodynamic effect on eGFR and assessing for effects on disease progression: At a preIND meeting held in October 2016, the Division indicated that because of bardoxolone's pharmacodynamic effect on kidney function, on-treatment assessments of kidney function would be difficult to interpret as a drug effect on disease progression. As such, a post-treatment assessment of creatinine should be used to assess bardoxolone's efficacy in treating the disease. Following submission of the IND in 2016, *the Agency repeatedly voiced concerns about the time-course for resolution of bardoxolone's pharmacodynamic effect on creatinine/eGFR following discontinuation of treatment and whether the off-treatment values collected in CARDINAL Phase 3 were in fact capturing an effect on disease progression.* The Agency ultimately recommended that the Applicant conduct a separate study to characterize the time course for resolution of bardoxolone's pharmacodynamic effect or modify CARDINAL Phase 3 to obtain the information (i.e., revise the protocol to include additional off-treatment eGFR measurements).

- Accelerated Approval: In January and September 2020, the Applicant met with Agency to discuss submission of an NDA for bardoxolone under the accelerated approval pathway based primarily on the Year 1 data on eGFR from CARDINAL Phase 3. *The Division did not agree with the proposed approach, voicing concerns about the interpretability of the eGFR findings given the available information on the time course for resolution of bardoxolone's pharmacodynamic effect, as well as the amount of missing data in the bardoxolone arm and lack of clarity on how patients with missing data were handled in key analyses intended to disentangle the drug's pharmacodynamic effect on kidney function from its effect on the irreversible loss of kidney function.*

- Bardoxolone's effects on blood pressure and albuminuria: At the January and September 2020 meetings with the Applicant, the Agency voiced concern about bardoxolone's effects on blood pressure and albuminuria and whether, over the long term, these effects could accelerate progression to kidney failure.
- Trial integrity: In November 2020, the Applicant submitted an addendum to their SAP dated October 30, 2020, and an amended Data Access Plan dated August 28, 2020 for CARDINAL Phase 3. In its December 2020 response to the submission, the Agency expressed concern about the number of individuals with access to patient-level clinical data and individual treatment assignments following the interim analysis of data from Year 1, as well as the late changes to the study's SAP, and provided specific recommendations on additional information and analyses that should be included in the Applicant's marketing application to address the integrity of the trial data. [Footnote omitted.]

(Emphasis added.)

26.     Though the FDA agreed that Reata's Phase 3 study met its endpoints, "the FDA review team d[id] not believe the submitted data demonstrate that bardoxolone is effective in slowing the loss of kidney function in patients with AS and reducing the risk of progression to kidney failure." Among other things, the FDA noted that a "treatment can have both reversible [pharmacodynamic] effects on kidney function as well as change the trajectory of the decline in kidney function . . . , but it can be difficult to tease apart the contribution of each component in trials with short treatment duration and/or when off-treatment

measurements of eGFR are obtained before the pharmacodynamic effect on eGFR

has fully reversed." It further stated:

> The CARDINAL Phase 3 study consisted of two years of longitudinal on-treatment eGFR assessments with two 4-week washout periods, after Year 1 and Year 2, respectively. The time-course of eGFR changes in the bardoxolone and placebo groups is shown in Figure 4 [omitted]. eGFR increased compared to placebo while on treatment at Week 48 and Week 100, as evaluated by the primary efficacy endpoint; however, eGFR decreased during each of the 4-week washout periods, suggesting that the on-treatment increase in eGFR was, at least in part, a result of the reversible PD effect of bardoxolone on eGFR. If the duration of the washout was long enough to eliminate the reversible PD effect on eGFR, then changes in eGFR compared with placebo at the end of the Year-2 washout period could indicate bardoxolone's effect on slowing disease progression. *A key issue was to determine if the study's 4-week washout was long enough for the reversible PD effect on eGFR to have resolved.*

> [Reata] has justified the 4-week washout in CARDINAL Phase 3 based on: various pooled analyses of patients across studies with eGFR measurements collected up to 42 days off-treatment; off-treatment eGFR measurements for studies in patients with CKD with treatment duration ≤8 weeks; the pharmacokinetic (PK) profile of bardoxolone; exposure-response modeling; and time to return to baseline of other PD markers, such as liver enzymes. *The FDA has not found these justifications compelling to support the adequacy of a 4-week washout in patients with AS*, as described in Appendix 6.4.

> (Emphasis added.)

27.    On this news, the Company's stock price fell $29.77, or 38%, to close at

$48.92 per share on December 6, 2021, on unusually heavy trading volume.

28.    Then, on December 8, 2021, the FDA's Advisory Committee unanimously decided that bardoxolone was not effective based on the submitted data.

29.    On this news, the Company's stock price fell $25.31, or 46%, to close at $29.11 per share on December 9, 2021, on unusually heavy trading volume.

30.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

31.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Reata securities publicly traded on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Reata, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

32.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Reata securities were actively traded on the NASDAQ. While the exact number of Class members is

unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

33.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

34.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

35.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Reata;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the

statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Reata to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Reata securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

36.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

37.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Reata shares met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- As a public issuer, Reata filed periodic public reports;

- Reata regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Reata's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Reata was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

38.    Based on the foregoing, the market for Reata securities promptly digested current information regarding Reata from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

39.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants**

40.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

41.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

42.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

43.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Reata securities during the Class Period.

44.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Reata were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Reata, their control over, and/or receipt and/or modification of Reata's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Reata, participated in the fraudulent scheme alleged herein.

45.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Reata personnel to members of the investing public, including Plaintiff and the Class.

46.    As a result of the foregoing, the market price of Reata securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Reata securities during the Class Period in purchasing Reata securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

47.    Had Plaintiff and the other members of the Class been aware that the market price of Reata securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Reata securities at the artificially inflated prices that they did, or at all.

48.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

49.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Reata securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

50.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

51.    During the Class Period, the Individual Defendants participated in the operation and management of Reata, and conducted and participated, directly and indirectly, in the conduct of Reata's business affairs. Because of their senior positions, they knew the adverse non-public information about Reata's misstatement of revenue and profit and false financial statements.

52.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Reata's financial condition and results of operations, and to correct

promptly any public statements issued by Reata which had become materially false or misleading.

53.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Reata disseminated in the marketplace during the Class Period concerning Reata's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Reata to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Reata within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Reata securities.

54.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Reata.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of

the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)      awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)      awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 18, 2022          **THE ROSEN LAW FIRM, P.A.**

*/s/Laurence M. Rosen*
Laurence M. Rosen, Esq.
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*